UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

| | | |
|---|---|---|
| BRUCE R. MOILANEN, # 235252, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:08-cv-368 |
| | ) | |
| v. | ) | Honorable Joseph G. Scoville |
| | ) | |
| MARY BERGHUIS, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**
**<u>AFTER NONJURY TRIAL</u>**

This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983. Plaintiff's claims for compensatory and punitive damages arise from his involuntary exposure to environmental tobacco smoke (ETS) during his incarceration at the Brooks Correctional Facility (LRF) from October 12, 2005, to December 4, 2008. By stipulation, the case was tried to a magistrate judge, without a jury. Trial took place on three days in April and May 2012. Counsel[1] have now made their post-trial submissions, and the case is ready for decision. The following are the court's Findings of Fact and Conclusions of Law under FED. R. CIV. P. 52(a).

---

[1] Plaintiff was represented by Carolyn N. Koenig and defendants by Assistant Attorney General John L. Thurber. Both counsel represented their clients admirably.

**Findings of Fact**

A. **Procedural History**

1. Plaintiff Bruce Moilanen ("Moilanen") is an inmate in the Michigan Department of Corrections ("MDOC"). On April 21, 2008, three prisoners (Keith Forth, Kevin King and Moilanen) brought this civil rights action *pro se* under 42 U.S.C. § 1983 concerning the conditions of their confinement in the A wing of the Allegan Housing Unit at LRF. Plaintiffs alleged that defendants violated their rights under the Eighth Amendment's Cruel and Unusual Punishments Clause by allowing them to be exposed to ETS, causing harm to their immediate health and future health.

2. At all times relevant to the complaint, defendant Mary Berghuis was the Warden at LRF, defendant Rick A. Smith was the Deputy Warden, and defendant Mark Sutherby was the Assistant Deputy Warden in charge of housing.

3. The court dismissed the complaint on initial screening. On appeal, the Court of Appeals vacated and remanded plaintiffs' complaint for further proceedings. Thereafter, the claims of plaintiff Forth were dismissed for lack of prosecution. By agreement of the parties, the claims of plaintiff King were dismissed without prejudice, in favor of identical claims asserted in an already pending lawsuit in the Northern Division of this Court, *King v. Sherry*, No. 2:07-cv-133. Ultimately, King agreed to a settlement in his case. Plaintiff Moilanen proceeded and seeks an award of damages, both compensatory and punitive, against defendants.

4. After plaintiff amended his complaint, defendants filed a motion for summary judgment. The court denied defendants' motion, identifying the following unresolved factual issues: (1) whether plaintiff was suffering from a serious medical condition requiring a smoke-free

environment while he was incarcerated at LRF and (2) whether defendants displayed deliberate indifference to an exacerbation of his condition by exposure to ETS.

5. Counsel then filed an appearance on behalf of plaintiff, and the parties were granted further time for discovery and trial preparation.

6. Nonjury trial commenced on April 19, 2012, with plaintiff's presentation of testimony from witnesses Kevin King (MDOC prisoner), Randy Vincent (MDOC prisoner), Jeffery Rurka (MDOC prisoner), Michael Sloan (MDOC prisoner), Pam Cummings (an Assistant Resident Unit Supervisor at LRF), plaintiff Bruce Moilanen, and Jason Carwile (a former Resident Unit officer at LRF). Plaintiff also presented testimony from Dr. Bhamini Sudhir (a medical doctor who examined plaintiff in November 2011) and James Repace (a scientist offered as an expert on the effects of ETS).

7. The trial continued on April 20, 2012, with the continued testimony of plaintiff. Defendant presented the testimony of Thomas A. Vogel (the Regional Environmental Sanitarian for the MDOC), Rick Smith (a Deputy Warden at LRF), Mark Sutherby (former Housing Director at LRF) and Warden Mary Berghuis. Defendant also presented expert testimony from Michael Eichenhorn, M.D., on the effects of ETS exposure. The trial was adjourned at plaintiff's request for the purpose of procuring the testimony of Dr. Stephen Jay and possibly Dr. Stallman.

8. Trial resumed on May 23, 2012, with the testimony of Stephen Jay, M.D., who reviewed plaintiff's medical record and opined that some of plaintiff's present medical conditions were likely caused by long-term exposure to ETS. After brief testimony from Mr. Moilanen, the parties rested.

9. Both parties have now submitted post-trial briefs, and the case is ready for decision.

B. **Regulation of Smoking in MDOC Institutions**

10. Reacting to findings by the U.S. Surgeon General concerning the health hazards of ETS, on March 18, 1991, Governor John Engler issued Executive Order 1992-3, regulating smoking in state-owned buildings. (Plf. Ex. 15). The Executive Order prohibited smoking in all state-owned buildings effective June 15, 1992. The Order also required department heads to revise the written policies and regulations to conform to the order. With specific reference to housing units in prisons and other state-run living facilities, the Order allowed the designation of exempt areas (where smoking would still be allowed) as long as smoke-free units were still available for nonsmoking residents. The Order prohibited the sale of tobacco products in government facilities, *except* within the security perimeter of state correctional facilities. Therefore, although smoking inside prisons was prohibited, the sale of tobacco products was not.

11. In accordance with Executive Order 1992-3, the MDOC promulgated Policy Directive 01.03.140, prohibiting smoking in all MDOC buildings (including all housing units) and within the near vicinity of all entrances. The policy directive allowed general population prisoners to purchase and to possess tobacco products in the housing units. Violations by both staff and prisoners were cause for discipline.

12. The Allegan Unit at LRF is a Level II facility. This level of custody is comparatively low and involves greater prisoner trust and freedom and less staff oversight then higher custody levels. In the Allegan Unit at LRF, three staff members were assigned to supervise

all functions in a unit housing 240 prisoners. The testimony at trial established that despite the policy directive, some prisoners at LRF smoked in their housing units, either in their rooms or in common areas. As a practical matter, it was virtually impossible to prevent smoking completely in a Level II prison where inmates were allowed to purchase and possess tobacco. Although guards did write misconduct tickets when smoking was detected, they were not able to police all rule violations.

13.   In 2004, Policy Directive 01.03.140 was amended to require wardens to designate tobacco-free housing units. (Plf. Ex. 8, ¶ M).[2] Prisoners living in such units were prohibited from purchasing or possessing tobacco products anywhere in designated tobacco-free areas. (*Id.*, ¶ N). Wardens were directed to assign nonsmoking staff to those units. (*Id.*, ¶ O). Thus, the 2004 policy directive introduced a dichotomy with regard to housing units. All units were "no smoking" (*i.e.*, prisoners could possess tobacco but could only smoke outside), but only designated units were "tobacco free" (prisoners could not possess tobacco or smoke anywhere in or around the unit).

14.   The testimony of defendant Smith, who was Deputy Warden at LRF when the 2004 revised policy took effect, described the efforts of prison administrators to establish the entire Allegan Unit as a designated "tobacco free" housing unit under the 2004 policy. The Allegan Unit is composed of four wings. Wings A and C are on the lower floors and Wings B and D are above. (*See* Plf. Ex. 12, a diagram of the Unit). Each wing opens into a common area containing dayrooms and other special purpose rooms. All four wings and the common area share common ventilation, so smoke in one wing of the Unit can migrate to other parts. The administration therefore wanted

---

[2] Plaintiff's Ex. 8 is the 2006 version of this policy directive, but it is materially identical to the 2004 policy.

to make the entire Unit, comprising 240 prisoners, tobacco-free. Allegan Unit was chosen because it had handicap accessible cells in C Wing. Prison officials identified all prisoners who had declared a preference for non-smoking units (by executing Form CH-100) and began to transfer them involuntarily to the Allegan Unit. Inmates resisted this effort, as they often did not want to be transferred. After thirty or forty inmates were transferred, the level of prisoner resistance caused officials to stop their efforts.

15.     Defendant Smith testified that prison officials then began a system of voluntary transfers of non-smokers to the A Wing of the Allegan Unit. At one point, all of A and B Wings and part of C Wing housed non-smokers and therefore were designated "tobacco free." Inmates in these areas were prohibited from smoking and from possessing tobacco. The prison was never able to assemble 240 prisoners who had executed a form CH-100, requesting housing in a tobacco-free environment. Therefore, only parts of the Allegan Unit were designated as tobacco-free; some smokers continued to be lodged in that unit, which was never designated "tobacco free" in its entirety. Those inmates housed in non-"tobacco-free" areas were not allowed to smoke in the unit or near the entrance, but, as required by the policy and State law, they were allowed to buy and possess tobacco products.

     **C.**    **Conditions in the Allegan Unit During Plaintiff's Incarceration**

16.     Plaintiff Bruce Moilanen was transferred to LRF from the Chippewa Correctional Facility on October 12, 2005. He immediately asked for placement in a tobacco-free unit. Plaintiff was assigned to the A Wing, which was designated tobacco-free. However, as found

above, A Wing shared common air and ventilation with the remainder of the Allegan Unit, parts of which were not designated "tobacco free."

17. Plaintiff called several inmate witnesses who testified that they smoked regularly in the Allegan Unit and that they witnessed inmates or prison staff smoking in the unit. Defendants presented testimony that the rule against smoking in the unit was enforced to the extent possible and that prison staff issued numerous misconduct tickets for violation of the rule against smoking in the unit. The court credits all testimony in part. It is undisputed that the Allegan Unit was never designated "tobacco free" in its entirety. Thus, a significant number of smokers were housed in the unit at any given time.[3] Although smoking in the unit was prohibited, it is credible that convicted felons would regularly violate this rule, to the extent that they could do so without detection. Given the low ratio of staff to inmates in this Level II institution, the chances that some surreptitious smoking would be undetected were high. Nevertheless, staff wrote over 760 misconduct tickets for smoking at LRF between April and December, 2007. Over 200 citations were issued in the Allegan Unit from August 1, 2007, through January of 2009. The court does not credit the exaggerated claims of some prisoner-witnesses concerning flagrant and open violation of the no-smoking rule. The evidence supports a finding that some prisoners regularly broke the rules, despite efforts of staff.[4]

---

[3] *See, e.g.,* Plf. Ex. 17, p. 9, dated 12/27/2007 (of the 240 residents in Allegan Unit, 168 had requested tobacco-free housing; 72 were smokers).

[4] Similarly, the court does not credit the exaggerated testimony of plaintiff and his witnesses concerning the pervasive existence of smoke residue on walls, furniture, and fixtures in the Allegan Unit. The porters regularly cleaned furniture, and the administration responded to complaints about soot on the walls or other effects of smoking. Some physical effects of smoking did appear on walls and furniture, and the testimony established that this residue could contain toxins.

18.     In summary, the court finds that during the time of plaintiff's incarceration in the Allegan Unit, prisoners violated the rules by smoking in their rooms or common areas. Because of the common ventilation system in the unit, nonsmokers such as plaintiff were regularly exposed to ETS. As a result of enforcement efforts, however, smoking was not pervasive.

19.     In an effort to quantify the amount of ETS in the air in the Allegan Unit, plaintiff called James Repace, a scientist with an international reputation in the area of second-hand tobacco smoke. Mr. Repace has generated a peer-reviewed model for estimating the concentration of fine particulate matter, $CO_2$ and nicotine from ETS in any enclosed space. This mathematical model (called the Mass Balance Model) predicts the level of ETS in the air by reference to the number of smokers, room volume, and the air exchange rate. In this model, the air pollution concentrations from ETS in a given space are directly proportional to the number of smokers and inversely proportional to the air exchange rate. He used available information concerning the volume by cubic feet of the entire Allegan Unit and air exchange rates from the American Society of Heating, Refrigeration and Air Conditioning Engineers (ASHRAE) pertinent to prison buildings (20 cubic fee/minute/occupant). For the smoker density, however, Mr. Repace accepted the estimates of prisoner King (a former plaintiff in this case) concerning the number of illicit smokers housed in Allegan Unit, and he applied assumptions garnered from the free world: each smoker would smoke two cigarettes per hour, in each of 16 hours per day. These assumptions led Mr. Repace to conclude that plaintiff had been exposed to 114 to 241 micrograms per cubic meter ($\mu g/m^3$) while housed in Allegan Unit. This level of exposure increased his risk for lung cancer and a number of other diseases.

20. At the trial, Thomas A. Vogel, the Regional Environmental Sanitarian for the MDOC, testified that the air exchange rate for the Allegan Unit is 10 cubic feet per minute, which meets the standard set by the American Corrections Association (not the ASHRAE standard, which is not binding). This is half the flow rate assumed by Mr. Repace in his pretrial calculations. On the basis of this information, Mr. Repace modified his calculations, testifying that the exposure rate experienced by plaintiff was double that reflected in his report. At this exposure rate, it is likely that an exposed population would suffer 23 to 48 excess deaths from cancer or heart disease per 10,000 persons.

21. The model used by Mr. Repace is widely recognized as accurate. It is as good, however, as its inputs. In this case, Mr. Repace accepted unsubstantiated estimates from convicted felons concerning the frequency of smoking in the unit, and he applied assumptions that are not supported by the evidence. Mr. Repace accepted the assertion that one-third to one-half of the inmates in the Allegan Unit smoked. He also applied the free-world assumption that each of these people would smoke two cigarettes an hour for 16 hours per day. Mr. Repace testified that this would result in air resembling that in a Detroit casino. These assumptions are unwarranted. Smoking in the housing unit was prohibited, and this rule was enforced, if imperfectly. It is inconceivable that one-third to one-half of the prisoners in Allegan Unit could possibly get away with smoking two cigarettes an hour, as if they were free citizens. Mr. Repace's estimates are therefore unreliable and are rejected. The level of plaintiff's exposure to ETS remains unproven on this record.

**D.     Defendants' Notice of Plaintiff's Medical Need for a Smoke-Free Environment**

22.     The record contains several medical reports concerning plaintiff's health problems. In assessing the state of defendants' knowledge concerning plaintiff's medical condition and resulting need for a smoke-free environment, only those records generated before or during the time of plaintiff's incarceration in Allegan Unit of LRF are relevant -- October 2005 through December 2008.

23.     While plaintiff was housed at LRF, he sent three Health Care Requests to the prison medical staff (February 15, 2006, June 12, 2006, and October 11, 2007) complaining of allergies, sinus problems, headaches, or related health concerns. (Plf. Ex. 14, pp. 4A, 4B and 4C). Each was answered by health staff. There is no evidence that any defendant was personally aware of plaintiff's health condition or these Health Care Requests.

24.     Plaintiff's documented health problems during the relevant period, as reflected in the trial exhibits, are as follows:

- The MDOC intake record, completed at the time of plaintiff's admission to the prison system (2/11/1994) reflects a history of asthma as a child and previous allergy testing. (Plf. Ex. 24).

- In December 1997, plaintiff was admitted to Standish Community Hospital and then the Foote Hospital for an apparent seizure, generalized. (Plf. Ex. 25). The diagnosis was that the seizure was a reaction to plaintiff's medication, fluoxetine (Prozac).

There is no evidence that any defendant was subjectively aware of this medical history.

25.     Plaintiff testified that he never spoke to Warden Berghuis, and that he spoke to the other two defendants concerning ETS only once. Plaintiff's evidence of the defendants' actual

knowledge of his medical need for a smoke-free living environment consists almost solely of prison grievances and correspondence. These exhibits disclose the following communications by plaintiff in support of his request for a smoke-free environment:

- A letter to Assistant Resident Unit Supervisor Shackleford dated October 8, 2007, complaining that the no-smoking policy was not being enforced. (Plf. Ex. 16, p. 6-A). No health problem was mentioned.

- A letter to Warden Berghuis dated October 25, 2007, complaining about smoke lingering in the air as a consequence of the Warden's instruction that power to cell ventilation fans be turned off at night. (Plf. Ex. 16, p. 6-B). Plaintiff asserted that the cigarette smoke caused him to suffer headaches, burning eyes, and sinus congestion.

- A letter to defendant Smith dated November 27, 2007, asking for a response to the previous letter to the Warden. (Plf. Ex. 16, p. 6-C).

- A letter to Warden Berghuis dated December 15, 2007, complaining about smoking and tobacco possession by prisoners in the Allegan Unit. (Plf. Ex. 16, p. 6-D). Plaintiff asserted that the lack of tobacco-free housing violated his rights under the Eighth Amendment and prison regulations and created a health hazard. He did not mention any specific medical condition suffered by him personally.

- A letter to defendant Smith dated December 20, 2007. (Plf. Ex. 16, p. 6-E). Smith had apparently met with plaintiff on December 19 to discuss plaintiff's complaints. In this letter, plaintiff did not alert Smith to any serious medical need.

- A letter to defendant Sutherby dated January 15, 2007, complaining that tobacco products were being sold to inmates lodged in "tobacco-free" areas in the Unit. (Plf. Ex. 16, p. 6-F). No personal health problem is mentioned.

- An institutional grievance dated December 19, 2007, against Warden Berghuis and other prison officials complaining about the sale of tobacco to prisoners in Allegan Unit and the lack of tobacco-free housing. (Plf. Ex. 17, p. 8). The grievance cited the Eighth Amendment and state law and policy. The grievance did not mention any health condition suffered by plaintiff. It only asserted that forcing him to breathe second-hand smoke "is inarguably hazardous to his health."

- A letter sent to Ms. Cummings, another Assistant Resident Supervisor, dated January 22, 2008, complaining about furniture in the day room stained by cigarettes. (Plf. Ex. 16, p. 6-G). Plaintiff asserted that this was a "health hazard" but mentioned no serious medical need of his own. Written responses on the face of the letter indicate that the furniture should be cleaned.

- A letter sent to defendant Smith dated April 4, 2008, again concerning staining and damage to furniture. Plaintiff contended that the ETS residue contained multiple toxins and posed a general health hazard. He said nothing about the condition of his own health. (Plf. Ex. 16, p. 6-I). Plaintiff sent an identical letter to Sutherby. (Plf. Ex. 16, p. 6-J).

- A letter to Warden Berghuis dated April 11, 2008, complaining about the presence of ETS in the Allegan Unit and criticizing the decision to house smokers and tobacco-free prisoners in the same unit. (Plf. Ex. 16, p. 6-K). Plaintiff did not alert

the warden to any serious medical need for tobacco-free housing, but said only that he was acting to "protect my future health."

26. The record is devoid of evidence that any defendant had subjective knowledge of any serious medical need requiring plaintiff to be housed in a tobacco-free unit. The court finds as a fact that no defendant both knew of and disregarded an unreasonable risk to plaintiff's health arising from a serious medical need.

27. Plaintiff never received a "Special Accommodation Notice"[5] from prison medical staff, or any other health provider, alerting housing staff of any medical need for a smoke-free environment.

### E. Transfer and Subsequent Events

28. On December 4, 2008, plaintiff was transferred to Lakeland Correctional Facility. Beginning in early 2009, plaintiff began to lose weight and suffer other health problems. His symptoms included hoarseness and a chronic cough. In 2009, an x-ray detected a calcified granuloma in his lung. In 2012, prison medical staff diagnosed COPD (chronic obstructive pulmonary disorder), a lung granuloma, and allergenic rhinitis. The expert medical witnesses called by plaintiff and defendant differed on the question whether plaintiff's later health problems were causally connected to his ETS exposure in the Allegan Unit. Plaintiff's expert, Dr. Stephen Jay, who is Board-certified in pulmonary medicine, testified that some of plaintiff's symptoms were likely

---

[5] Under MDOC Policy Directive 04.06.160 (eff. 1/10/2000), a prisoner identified as having a medical condition restricting his ability to function in prison is entitled to a "Special Accommodation Notice" from the medical staff setting forth necessary accommodations, including restrictions on housing (¶ E). MDOC medical staff issued such a notice for former plaintiff Kevin King (Plf. Ex. 2) on account of his coronary history. Plaintiff in this case did not have a Special Accommodation Notice.

caused by ETS exposure; defense expert, Dr. Michael Eichenhorn, also a pulmonary medicine diplomate, disputed this conclusion.[6]  It is not necessary to resolve this conflict, however, in light of the court's finding concerning the lack of deliberate indifference by any defendant.

29.     The 2009 Appropriations Bill passed by the Michigan Legislature (Act 245 of the Public Acts of 2008) required that the MDOC make all state penal institutions tobacco-free no later than March 1, 2009.  The Department therefore amended Policy Directive 01.03.140 (eff. 2/1/2009) to prohibit all smoking and possession of tobacco by prison inmates and staff.[7]  It is undisputed that after February 1, 2009, Michigan prisoners are no longer exposed to any significant levels of ETS.

## Conclusions of Law

Plaintiff's claims in this case arise under the Cruel and Unusual Punishments Clause of the Eighth Amendment to the United States Constitution.  The Eighth Amendment forbids prison officials from "unnecessarily and wantonly inflicting pain" on an inmate serving a sentence after conviction for a crime.  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  "These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration." *Estelle*, 429 U.S. at 103.  The medical consequences of tobacco smoke do not differ from other medical problems.  "'Prisoners allergic to the components of tobacco smoke, or who can attribute their serious medical condition to smoke, are entitled to appropriate medical treatment,

---

[6] All medical witnesses agreed that plaintiff's granuloma was not caused or aggravated by ETS exposure.  A granuloma is a scar, generally caused by a previous lung infection.  It is, by definition, benign.

[7] The policy directive made exception only for certain religious use of tobacco products.

which may include removal from places where smoke hovers.'" *Hunt v. Reynolds*, 974 F.2d 734, 735-36 (6th Cir. 1992) (quoting *Steading v. Thompson*, 491 F.2d 498, 500 (7th Cir. 1991)).

Nevertheless, however, the Sixth Circuit holds that the mere exposure of a prisoner to ETS, without more, does not constitute a deprivation of a prisoner's Eighth Amendment rights. *Hunt*, 974 F.2d at 735. To be entitled to relief, therefore, a plaintiff must establish one of two distinct types of claims -- a future-injury claim or a present-injury claim. *See Atkinson v. Taylor*, 316 F.3d 251, 262-69 (3d Cir. 2003); *Henderson v. Sheahan*, 196 F.3d 839, 844-47 (7th Cir. 1999). In a future-injury claim, a plaintiff may establish entitlement to injunctive relief against ETS exposure by showing that the level of ETS in the prison creates an unreasonable risk of future health, to which prison officials have displayed deliberate indifference. *See Helling v. McKinney*, 509 U.S. 25 (1993). In a present-injury claim, a plaintiff must establish that he suffers a serious medical need for a smoke-free environment and that prison officials displayed deliberate indifference to that need, resulting in an actual injury to plaintiff's health. *See Hunt*, 974 F.2d at 735.

A claim for injunctive relief in a future-injury case under *Helling* does not require a plaintiff to show any presently existing health problem. The focus in an action for injunctive relief under *Helling* is on whether the level of ETS to which a prisoner has been involuntarily exposed "is such that his future health is unreasonably endangered," and an assessment whether society "considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." 509 U.S. at 35, 36. *Helling* entitles a prisoner to injunctive relief against future ETS exposure on a showing that prison officials have been deliberately indifferent to such an unreasonable risk, despite the fact that plaintiff has no "current serious health problems." *Id.* at 34. A prison's implementation, and good-faith

enforcement, of a no-smoking policy is generally sufficient to preclude injunctive relief under *Helling*. 509 U.S. at 35-36; *see Talal v. White*, 403 F.3d 423, 427 (6th Cir. 2005) (good faith, but imperfect, enforcement of no-smoking policy does not give rise to liability); *McIntyre v. Robinson*, 126 F. Supp. 2d 394, 407 (D. Md. 2000). The ability of a Michigan prisoner to succeed on such a *Helling* claim has been abrogated since February of 2009, by virtue of the state Legislature's direction that all Michigan prisons must be tobacco-free. The parties agree that Michigan prisoners have not been exposed to any substantial amount of ETS since that time. The *Helling* standards for injunctive relief are therefore irrelevant to the present case.

Thus, if plaintiff is to prevail in this action, he must establish a "present-injury claim," which has both an objective and a subjective component. To satisfy the objective component, a prisoner must show that his medical needs are "sufficiently serious." *Hunt*, 974 F.2d at 735. This requires more than a preference to be housed away from tobacco smoke -- the exposure to smoke must cause more than "mere discomfort or inconvenience." *Id.* at 735; *accord Talal v. White*, 403 F.3d at 426; *Henderson*, 196 F.3d at 846 ("*Helling* did not hold that exposure to ETS qualifies as an objectively serious injury *per se*."). To satisfy the subjective component, "a prisoner must show that prison authorities knew of, and manifested deliberate indifference to, his serious medical needs." *Talal*, 403 F.3d at 426.

Plaintiff's theory at trial was that the health problems that began to manifest themselves in 2009, including extreme weight loss, COPD, and other respiratory problems, were caused by plaintiff's exposure to ETS during the time he was previously housed in the Allegan Unit of LRF. Under Sixth Circuit authority, to succeed on this claim, plaintiff was first required to show that at the time he was housed in LRF, he "suffered from a serious medical condition that was

exacerbated by exposure to secondhand smoke." *Reilly v. Grayson*, 310 F.3d 519, 521 (6th Cir. 2002). Plaintiff's evidence establishes a very weak case for the existence of a serious medical need during the term of plaintiff's incarceration at LRF. Plaintiff did have a history of childhood asthma, documented in 1994 when he was admitted to the Michigan prison system. There is virtually no evidence of treatment for asthma during the time he was at LRF. The record reflects only three health care requests involving respiratory problems (allergies, congestion, draining sinus, and headaches) during this time. (Plf. Ex. 14, pp. 4-A, 4-B, and 4-C). In none of these requests did plaintiff use the word "asthma." A chronic condition such as asthma may indeed constitute a serious medical condition for purposes of an ETS claim. *See Reilly*, 310 F.3d at 520. There is little evidence, however, that plaintiff was suffering from asthma during the period he was housed at LRF. Nevertheless, it is unnecessary for the court to make a definitive finding on the existence of the objective element of an Eighth Amendment claim, as plaintiff has clearly failed to establish the subjective element. Therefore, the court assumes without deciding that plaintiff was suffering from a serious medical condition while he was housed at LRF.

Plaintiff's proofs are completely inadequate to establish the subjective component of an Eighth Amendment violation with regard to any defendant. To satisfy the subjective component, a plaintiff must demonstrate that an individual defendant acted with a "sufficiently culpable state of mind in denying medical care." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir. 2004). A prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement "unless the official knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Thus, the subjective element itself contains two components. The first is actual knowledge of the inmate's serious medical need. "It

is not enough merely to find that a reasonable person would have known, or that defendant should have known . . . ." *Farmer*, 511 U.S. at 843 n.8. The second component concerns the defendant's callous disregard of facts actually known to him. Deliberate indifference is characterized by "obduracy and wantonness." *Whitley v. Albers*, 475 U.S. 312, 319 (1986). It cannot be predicated on negligence, inadvertence, or good-faith error. *Id.* Under this standard, a prison official who was subjectively unaware of the substantial risk of harm to an inmate may not be found liable under the Eighth Amendment. *Farmer*, 511 U.S. at 842.

        Plaintiff's proofs fail to show subjective knowledge of his serious medical condition, whatever it was, by any of the named defendants. The record is replete with plaintiff's written communications to each defendant, demanding that he be placed in a smoke-free environment. Plaintiff had every opportunity to inform defendants of a medical condition necessitating such treatment, but he did not do so. Plaintiff's letters and kites to defendants read more like legal briefs than requests for relief from a serious medical condition. Plaintiff's demands for a smoke-free environment cited the Constitution and state law, not medical records. Plaintiff complained of the general health hazards of ETS, not that a specific medical condition of his own required a smoke-free environment.

        Defendants, who were highly placed administrators in the prison, cannot possibly be expected to be aware of each prisoner's specific medical condition or for the need for special accommodations. Michigan prisons have a system in place to notify prison administrators of the need for medical accommodations in housing -- the Special Accommodation Notice. It is undisputed that plaintiff did not procure such a notice from the medical staff. In previous cases finding deliberate indifference to a serious medical need to be free of ETS, the courts have relied on the

actual notice given prison administrators by the existence of such a special medical notice. *See, e.g., Reilly*, 310 F.3d at 521 (evidence showed that defendants "deliberately failed to respond to the repeated recommendations by medical personnel that [plaintiff] be removed to a smoke-free environment"); *Talal*, 403 F.3d at 427 ("limited activity notice" in prison file sufficient to alert defendants of need for non-smoking cell partner). No such evidence exists in the present case. Plaintiff's numerous demands for a smoke-free environment emphasized only his legal rights and the general hazard to health posed by exposure to ETS. If he was suffering from a serious medical condition, no defendant was subjectively aware of it, either as a result of plaintiff's own correspondence or notices placed in the housing file by medical personnel. "A prison official cannot be deliberately indifferent to a serious medical need [for a smoke-free environment] if there is insufficient documentation to put the official on notice of the need." *Panton v. Nash*, 317 F. App'x 257, 259 (3d Cir. 2009).

The deliberate indifference standard is an exacting one. The Supreme Court has likened the subjective requirement of an Eighth Amendment claim to criminal recklessness. *Farmer*, 511 U.S. at 839-40. Although each defendant obviously knew that plaintiff was unhappy with the level of ETS that existed in the Allegan Unit, this, standing alone, is insufficient to show deliberate indifference. To prevail in the present case, plaintiff was required to establish not only that defendants knew of his desire for smoke-free housing, but also knew that his desire was grounded in a serious medical need for such an accommodation. Only if a prison official knows that a prisoner suffers from a medical condition that will be exacerbated by exposure to ETS can the official be deemed guilty of the "wanton and unnecessary infliction of pain." "To satisfy the subjective component [in an ETS case], a prisoner must show that prison officials knew of, and manifested

deliberate indifference to, his serious medical needs." *Talal*, 403 F.3d at 426; *accord, Hunt*, 974 F.2d at 735 (plaintiff must show knowledge of a "pre-existing medical condition such that exposing [him] to ETS represents a serious health threat."). Denial of a no-smoking environment to a prisoner who requests such accommodation as a matter of legal right, not medical necessity, does not violate the Eighth Amendment.

## Conclusion

The court finds by a preponderance of the evidence that no defendant knew that plaintiff suffered from a serious medical need for a smoke-free environment or that any defendant was deliberately indifferent to such a need during the time that plaintiff was housed in the Allegan Unit. Judgment will therefore be entered for defendants on plaintiff's Eighth Amendment claim.

Dated:  November 13, 2012            /s/  Joseph G. Scoville
                                     United States Magistrate Judge